FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Mar 22, 2022

OFFICE OF THE CLERK

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Western District of Arkansas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>411 EAST 12TH STREET, TEXARKANA, ARKANSAS,<br>71854 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   4:22-cm-06

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Western _____ District of _____ Arkansas _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiring to distribute a controlled substance |
| 18 U.S.C. § 924(c) | Using, carrying, or possessing a firearm in connection with drug trafficking |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

AUSA Jonathan R. Hornok
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date: March 22, 2022

_____
*Judge's signature*

City and state:  Texarkana, Texas

Hon. Caroline M. Craven, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 411 EAST 12TH STREET, TEXARKANA, ARKANSAS, 71854 | Case No. ___4:22-cm-06___<br><br>**SEALED** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Aaron Lewis, a Special Investigator with the Texarkana Texas Police Department having been duly sworn, do hereby depose and state as follows:

## INTRODUCTION

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search premises located within the Western District of Arkansas known as 411 East 12th Street in Texarkana, Arkansas (the "SUBJECT PREMISES"), further described in Attachment A, for the body of DEABLO DESHON LEWIS and the things described in Attachment B.

2.     I am a peace officer in the State of Texas and have been so for the past seven years. Affiant is employed by the Texarkana Texas Police Department and is currently assigned to the Special Investigative Unit as a Narcotics Investigator. While employed with the Texarkana Texas Police Department (TTPD), I have served as a patrol officer, Texas Commission on Law Enforcement Instructor, Defensive Tactics Instructor, Canine Handler,

**SEALED**                        Page 1 of 22

and Narcotics Investigator. My training includes completion of a 643-hour police academy as well as numerous advanced investigations training courses. I hold an Advanced Peace Officer License in and for the State of Texas. I have had training and have participated in applying for and executing search warrants, arrest warrants, complaints, and indictments for narcotics trafficking.

3.      As a law enforcement officer, I have personally conducted or assisted in numerous investigations of criminal violations of the Texas Health and Safety Code as well as the Controlled Substances Act and other federal criminal statutes. Many of these investigations focused on organizations that have distributed, manufactured, or derived income from illegal sources, specifically from the unlawful distribution of cocaine, heroin, methamphetamine, marijuana, and other controlled substances. My investigations have ranged from simple drug possession to complex criminal conspiracies.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that DEABLO DESHON LEWIS A.K.A. PABLO LEW A.K.A. P, MICHAEL DARNELL PEACOCK A.K.A.

FRUIT A.K.A. D ("M. PEACOCK"), TERRANCE LAMAR PEACOCK A.K.A. T ("T. PEACOCK"), JUSTIN MARSHALL OWENS, and others (the "SUBJECTS") are involved in conspiring to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846, and with using or carrying a firearm during and in relation to and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1)(A). There is also probable cause to search the property described in Attachment A, the SUBJECT PREMISES, for a person to be arrested and evidence and instrumentalities of these crimes, as described in Attachment B.

## INVESTIGATION

*April 2021 through February 2022*

6.      The Texarkana Texas Police Department (TTPD) has partnered with other law enforcement agencies to disrupt the flow of fentanyl into the Texarkana area. During the course of this joint investigation with the Drug Enforcement Administration (DEA), the Bi-State Narcotics Taskforce (BSNTF) and the Texas Department of Public Safety (DPS), investigators learned that LEWIS was conspiring with others to distribute fentanyl.

7.      In April 2021, investigators learned that LEWIS was selling fentanyl pills in Texarkana. Investigators executed a "buy-bust" operation targeting LEWIS. During this operation, LEWIS was arrested as he was

attempting to deliver fentanyl pills. LEWIS was interviewed by investigators. During that interview, LEWIS said that he had drugs at his residence in the Eastern District of Texas. A search of this residence on Sandlin Avenue in Texarkana yielded more than three hundred grams of fentanyl pills, other drugs, two firearms, and several cellular devices. LEWIS was arrested on state charges and released on bond shortly thereafter.

8.     In February 2022, investigators learned that LEWIS was selling drugs at a residence on Gatling Street in Texarkana, Texas. At this location, investigators observed what appeared to be a drug transaction. Knowing that LEWIS had active warrants for his arrest, investigators conducted a traffic stop on LEWIS after he left that location. LEWIS was stopped as he turned into an apartment complex located at 1601 Allen Lane, Texarkana, Texas, which is known as the Sunset Apartment Complex. LEWIS came to a stop by building "8." LEWIS had marijuana and cell phones on his person. A search of the residence on Gatling Street yielded various drugs, including methamphetamine and fentanyl pills, however these drug seizures were significantly less than the number of drugs seized from Sandlin Avenue. LEWIS was charged accordingly and released on bond shortly thereafter.

9.     Later in February 2022, Investigators were contacted by a concerned person who said that LEWIS was selling fentanyl pills to someone who was reselling the pills at 411 Waterman in Texarkana, Texas.

Investigators drove to this address and saw LEWIS in the front yard beside a 2005 Dodge Ram truck bearing Arkansas license plate number "234VUL," which is registered to LEWIS.

*Indictment*

10.     On March 10, 2022, a United States Grand Jury in the Eastern District of Texas returned an indictment charging LEWIS, M. PEACOCK, T. PEACOCK, and OWENS with conspiring to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846, and with using or carrying a firearm during and in relation to and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1)(A). The indictment further alleges that the use of controlled substances distributed by these defendants resulted in the death of three people and serious bodily injury to a fourth. On the basis of this indictment, this Court issued warrants, which are currently outstanding, for the arrest of LEWIS, T. PEACOCK, and OWENS.

*1601 Allen Lane, Apartment 18*

11.     On March 17, 2022, a TTPD officer stopped LEWIS in his red, 2005 Dodge truck. The officer was not aware of the outstanding warrant for LEWIS. LEWIS told the officer that he had been at the Sunset Apartment Complex. When asked for his address, LEWIS gave the officer the address 1601 Allen

**SEALED**

Lane in Texarkana, Texas. LEWIS refused to give an apartment number and said that he was staying at multiple locations.

12.    On March 18, 2022, Investigators received the return from one of the cellular devices seized from LEWIS in February 2022. There were dozens of conversations on the phone where LEWIS told customers to meet him at the Sunset Apartment Complex to buy fentanyl, hydrocodone, and marijuana. Specifically, LEWIS told customers to come to the Sunset Apartment Complex and to turn into the third drive on the right. In one instance, LEWIS instructed a person to come to building "8." Building "8" is located on the third drive on the right side of the complex as you enter. Investigators then reviewed the phone calls made by LEWIS while incarcerated in February 2022 and found a call to Tobie Roberson. LEWIS told Roberson that he was going back to "Sunset" when he was stopped by police. LEWIS'S mother, Mary Lewis, currently resides at 1601 Allen Lane, Apartment 18, Texarkana, Texas. Apartment 18 is located in building "8" overlooking the third right turn in the apartment complex. This is the same building and location that LEWIS had instructed dozens of people over months of time to meet him to sell narcotics. This is also the location described by LEWIS himself of where he was coming from on the night of March 17, 2022.

13.    I know through my training and experience in investigating narcotic related offenses that drug traffickers take significant steps to protect

themselves and their drugs and drug proceeds. In my experience, it is common for drug dealers to use multiple locations—often residences—to protect their drugs and drug proceeds. For example, a drug dealer may use one or more locations to sell drugs—"trap houses"—and other locations to store drugs and drug proceeds—"stash houses." Similarly, a drug dealer may spread their activities, drugs, and drug proceeds across multiple trap houses. A drug dealer may also conduct drug transactions in public places—such as a publicly accessible parking lot—that are close to a stash location but that do not reveal to drug customers the exact location of the dealer's drug stash. These tactics ensures that little is lost in the event of a law enforcement seizure or a drug robbery during a transaction or at a trap house, the location of which is more easily discoverable because it is the location of actual drug transactions. Finally, a drug dealer's stash house—and valuable store of drugs and drug proceeds—is often controlled by a trusted third party, such as a family member or close confidant.

14.     Based on this long-term investigation, I believe that LEWIS has adopted some of these methods. For example, investigators found only a relatively small amount of drugs at the Gatling Street residence where LEWIS was staying in February 2022. But on that day, officers stopped LEWIS as he was driving into the Sunset Apartment Complex toward building "8." Based on the conversations in the phone seized from LEWIS that day, LEWIS was

SEALED                    Page 7 of 22

facilitating dozens of drug sales each day at building "8" at the Sunset Apartment Complex. The quantity of drugs needed to complete these drugs transactions was far greater than what was recovered from the Gatling Street residence, which is approximately a half mile from the Sunset Apartment Complex.

15.     Investigators have learned from a database search that LEWIS'S mother, Mary Lewis, lives in apartment 18 at the Sunset Apartment Complex. Apartment 18 is in the far east end of building "8" and overlooks the third right driveway in the complex. Simply put, LEWIS'S phone revealed that he was directing dozens of drug customers to approximately 20 feet from his mother's front door. Among the other residents that live in building "8," there is no other discernable relationship to LEWIS except Roberson, whose apartment is located on the opposite side of the building from where LEWIS was instructing people to go.

16.     LEWIS also has numerous children that he posts photographs with on his public Facebook page "Lambo Lew." Of those children, two of them were seen playing in front of Apartment 18 on March 21, 2022.

17.     Based on this investigation and my training and experience, I believe that LEWIS is using 1601 Allen Lane, apartment 18 in Texarkana Texas, as a place to store drugs, drug proceeds, weapons, cell phones, and other

**SEALED**               Page 8 of 22

tools of the drug trade. I also believe that LEWIS is using apartment 18 as a primary or secondary residence.

*411 East 12th Street*

18.     On March 18, 2022, Investigators received the return from one of the cellular devices seized from LEWIS in February 2022. There were dozens of conversations on the phone where LEWIS arranged meetings with customers to sell fentanyl, hydrocodone, and marijuana. In addition to drug transactions at the Sunset Apartment Complex, LEWIS also told customers to come to multiple locations on and around North Stateline Avenue in Texarkana, which is close to his grandmother's residence at 411 East 12th Street in Texarkana, Arkansas. During this investigation, investigators learned that LEWIS mows yards in addition to selling illegal narcotics. For example, in one text message conversation, LEWIS said that he would meet with a person to sell them drugs after he was finished mowing a yard. LEWIS'S Dodge truck and lawncare equipment have been seen at the East 12th Street residence dozens of times over past several months. The Dodge truck and lawncare equipment were last seen at the East 12th Street residence in the early morning hours of March 21, 2022.

19.     Based on this investigation and my training and experience, I believe that LEWIS is also using the East 12th Street residence as a place to store drugs, drug proceeds, weapons, cell phones, and other tools of the drug

trade. I also believe that LEWIS is using the residence as a primary or secondary residence.

## DOCUMENTARY AND ELECTRONIC RECORDS OF DRUG TRAFFICKING ACTIVITY

20. By this application, I seek permission to search for records (in whatever form they are found) that might be found in the SUBJECT PREMISES. One form in which the records might be found is data stored on a computer's hard drive or other storage media, including a cell phone.

21. Through my training and experience, I am aware that people engaged in drug trafficking often keep documentary and electronic records (collectively, "records") pertaining to their unlawful acts. For example, these records often contain the details of past drug transactions, including the identity of and contact information for transaction counterparties, the dates of transactions, the amounts of money exchanged or owed, and the types and amounts of drugs sold. Additionally, these records often contain financial information, including bank account numbers or money transmitting instructions.

22. I am also aware through my training and experience that those involved in drug trafficking frequently use cell phones to facilitate their illegal activity, including for communication and keeping records pertaining to drug trafficking activity. And because drug trafficking activates often continue for

many months and even years, those involved in drug trafficking in this area often keep cell phones and records for a long time—even substantially beyond the time during which they actually plan, perpetrate, and profit from their crimes. Thus, in my training and experience, cell phones in the possession of those involved in drug trafficking often contain records of drug trafficking related conversations and records.

23.    Moreover, I am aware through my training and experience that even if a cell phone is not expressly used to facilitate drug trafficking activity, it may nevertheless contain evidence of illegal activity. For example, because the operation of a cell phone often generates location information—including records of cell network utilization, GPS location tagging, and navigation history—and often contains user attribution information, a cell phone often reveals the historical location and identity of its user, including the user's presence at a relevant place during a time relevant to a drug trafficking investigation.

24.    Finally, I am aware through my training and experience that those involved in drug trafficking often keep their cell phones and records either on their person or nearby, including in the place where they are staying or in their vehicle.

**SEALED**                    Page 11 of 22

## TECHNICAL TERMS

25.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a)    IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b)    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c)    Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard

disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

26.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27.     *Probable cause*. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a)     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using

forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d)      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

28.     *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a)      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.

**SEALED**                    Page 15 of 22

Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b)     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log:

computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime

SEALED                    Page 17 of 22

(e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c)      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d)      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For

example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f)      *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a)      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic

evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b)     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c)     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

29.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging,

or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30.     Because several people may share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

31.     I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A, arrest DEABLO LEWIS pursuant to the outstanding arrest warrants, and seize the items described in attachment B.

32.     I also respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this

application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the subjects of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

*Appearing by phone*
Aaron Lewis
Special Investigator
Texarkana Texas Police Department

Subscribed and sworn to before me on _March 22, 2022_ by reliable electronic means under rule 4.1 of the Federal Rules of Criminal Procedure

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE